Thank you, Your Honor. May it please the Court, Jeremy Marwell for the University of Texas Appellants. For decades, Congress has allowed states to choose which of their own employees participate in the Social Security System and pay Social Security tax. States make this choice through an agreement with the Social Security Administration. UT's central contention in this case is that the tax questions are controlled by the plain language of the Social Security Regulation, which requires a case-by-case assessment. But why aren't they controlled by the agreement? I liked your opening statement, but then it seems to me that nobody has spent very much time on contract construction kind of arguments, and why is that? Why aren't we construing this agreement? So I think you are construing this agreement, and you're construing the word student as it occurs in that agreement. And I think you can find in our favor if you construe that in light of the Social Security Regulation, which we think is the appropriate elaboration on what the word student means. But not in light of the Social Security's announced contention that they disagreed with Appell and were only going to follow it in the Eighth Circuit? We're not to construe that piece? No. So I think with respect to the Social Security's position, you have a regulation on the books that was promulgated through notice and comment, and then you have Social Security ruling, an informal ruling, 78-3, and then the acquiescence ruling. We think for several reasons the acquiescence ruling and the 78-3 would not control here. First, I think whatever flavor of deference you might be inclined to apply, no deference doctrine allows an agency to take an informal interpretation that is contrary to the plain language of the regulation that's on the books. No, but we're talking about construing an agreement, and you construe an agreement in light of the surrounding circumstances. And the surrounding circumstance when you all did your second, your amendment, was the Social Security's announced position that outside of the Eighth Circuit, we think residents are not students. As well, that was the course of performance for eight, ten years, something like that, a number of years. So the two things that we would look at, which is the surrounding circumstances and the course of performance, cut against you. Why doesn't that end the matter without regard to what the regulation might mean in general and whatever? So I guess taking them in turn, first the circumstances in which the agreement was executed. You had on the books at the time the agreement was executed the longstanding Social Security regulation, and you also had the Eighth Circuit's decision in APFL, which said these contrary informal interpretations that say sort of in a conclusory fashion that residents are not students can't control, and they're in conflict with the plain language of the regulation and that plain language controls. So I think when you're looking at what Texas would have understood when it was signing this agreement, you had APFL on the books and you had the plain language on the books. And then as to course of performance, there's not – I would disagree that it's eight to ten years. The argument that Texas is making with respect to the state employee exemption based on the student amendment would not have been available until the agreement was amended in 1999. That amendment didn't take effect. It wasn't in effect until June of 2000. And the legal landscape with respect to how strong Texas's claim would be, we think, changed significantly when the Treasury Department amended its regulation. So how long were you doing the withholding consistent with the United States' now position? I think from June 2000 until the beginning of 2005. So five years? Four and a half, maybe. And this case involves the second three quarters of 2005, which are the first quarters that UT could claim this refund once the new Treasury regulation was in effect. So there are no quarters that UT was not making this claim once the legal landscape is as it is now. Which we think, again, that the plain language of the Social Security regulation, which has been in effect consistently, the Social Security Administration has not amended it in 16 years since APFL. And you have not only the Eighth Circuit but four other courts of appeals who looked at that regulation or looked at text that was very similar in the old Treasury regulation and said this is a case-by-case standard. And those courts rejected all the arguments that the government is making here and that the district court, the conclusion that the district court reached that you can have it. I'm sorry. I guess my question is when I read APFL and it mentions a case-by-case standard, it's the same case where the court seemed to make a categorical determination that residents were students. That seemed to be categorical. Is that what it was? I think that's correct. At least at the University of Minnesota. That's right. And so what the district court did here was to make a categorical conclusion without any facts about the residency programs at the University of Texas. So when you say case-by-case, you're not suggesting that we go resident-by-resident. That's correct. Individual-by-individual. That's not your suggestion. Right. And that's not what the case means. Right. So the Eighth Circuit said case-by-case, and it then went on in the same opinion to say… I'll follow up on that. Exactly what is case-by-case? It's not resident-by-resident. Is it specialty-by-specialty? Is it school-by-school? So I think that's probably a determination that the district court could make once it had a factual record, and it has no factual record. The only fact that the district court had was the concession that UT agrees that these residents worked more than 40 hours a week. What determination would you recommend the district court make in that connection as regards the University of Texas and its affiliates? So as the case comes to this Court, we have no record about what these different programs… Yeah, but this is your client. What do you think? What are these programs? How do they differ, or how are they similar to the University of Minnesota so that we'll know? Sure. So I think at a minimum, you have the fact that these residency programs are all accredited by the national body that sets specific requirements. And I think it's important to note that even though residents in our programs work more than 40 hours a week, that was the case with respect to all the cases that taxpayers won before the Treasury amended its regulations. So if you have an instinctive skepticism, maybe, about whether residents are truly students, I would refer you to how those other cases came out when it was a similar case-by-case standard. Okay. Let me come at it this way. You're asking for refund of all of the withholding for all of the residents in all of the different programs, specialties, and whatever. So… For the relevant quarters or whatever. Yeah. UT has sought a refund with respect to specific residents, and there's actually spreadsheets in the record on appeal. Okay. So it's not all. Right. So how are you making that determination? Because I think that was Judge Wiener's question. What's the distinction? Sure. I think so, for one, we are not claiming refunds for residents who didn't participate in a qualified retirement system, which is a separate statutory requirement that's not at issue because the district court didn't reach it. But we think that UT residency programs look a lot like the residency programs for which taxpayers received refunds under a case-by-case standard. They're accredited. There are specific requirements in terms of residents have to do rounds, grand rounds. They have a didactic relationship with the supervising faculty. They have to, you know, they progress through the program. In the first year of the residency, and this is something the district court, I think, got wrong. He said that the residents are licensed doctors. You know, under Texas law, a first-year resident gets essentially a provisional license, can only practice medicine under the supervision of the faculty members in the residency program. So it's like a learner's permit. And I think even under the district court's view sort of shows the difficulty of making this judgment as a matter of law without the full factual record. You know, the courts that actually had a full record and looked at these programs were able to conclude that residents were students. I mean, the reality is these residents can go around and make rounds, and they don't have to have the supervising doctor walking around with them. That guy's somewhere in the hospital with a pager. I mean, I'm just telling you how it works. I mean, I've seen it. Not at UT, but this is how I've seen in Texas. Thankfully, it wasn't me in the hospital, but it was a loved one, and there were residents out our nose and ears, but there were no anybody else. So my point is that it seems like it's not as if this person is, like, watching over the person directly. And, again, we don't have a record as it comes to this court, but I take the question. Maybe I would refer you to the Mayo Foundation case, 282F sub 2D997. They had a record, and a resident testified. He said, look, when you're practicing as a resident and you're trying to prescribe medication or whatever, it's very different because the doctors are always looking over your shoulder, and you're doing this, but you know that it's really the faculty member. But once you're done with your residency, you're out on your own, well, then that's a different story. They're looking over your shoulder by looking at a chart or whatever. They're not literally following you around, right? You know, again, we don't have a record, and the cases that got tried on a case-by-case standard, you actually had testimony from residents and from program directors. And the documents, I mean, the case comes to this court on a motion for partial summary judgment. The parties engaged in some discovery and then put that on hold to deal with this legal question. But, you know, the parties exchanged documents, UT produced the government documents, and there are specific program guides for each of the relevant residencies. Okay. Well, let me ask you this. If we sent this back, and so we're going to do this case-by-case, are you going to show up with this program that has all this stuff about how there's going to be all this supervision? Do you get to, do they get to try that actually there's not all this supervision? In fact, the guy's just somewhere with a pager somewhere in the building and isn't really looking over the charts or whatever? I would think so. Okay. So then that becomes very convoluted. Maybe there is, in the OBGYN department, that guy is very diligent about looking over the charts, whereas over in the gastroenterology, that guy is always on the golf course with his pager, hoping nothing goes wrong. And then you're going to say they're treated differently for withholding purposes, even though they're otherwise the same. They're otherwise working 80 hours and yadda yadda. Right. So I agree, I mean, I agree that there might be differentiation between the residents and the different programs, but that seems only to emphasize the inappropriate decision of treating them all, you know, excluding them without any assessment. Well, the Mayo, the Supreme Court said you need to draw lines. And, I mean, what I'm saying is your argument really makes this whole thing very chaotic. It's very difficult to draw lines because we can't even rely on the program as written because maybe they're not following the program as written. Let me try one because I'm still trying to get my arms around case by case. There have been some statements to the effect that what we're looking at is whether they're primarily there to get an education  Now, it doesn't matter other than the specific evidence to build a case, but it seems to me you could have a case by case approach that would take each med school or hospital's residency program and look at all the parts and come to a conclusion. These people are here primarily to earn a living or they're paid a modicum, a little bit of a living wage, but they are here to continue their education beyond med school, beyond internship, to get a specialty or a subspecialty. Would that be a fair assessment of case by case, or is that too general? I think so. Again, you have on the books the cases where courts were doing this before the Treasury Department, but not the Social Security Administration amended the rule. And I think you see them deciding on a sort of bucket by bucket basis. It's not an individual. You can do it as a program as a whole. And that's the kind of evidence that we exchanged in discovery. These are program guides about the programs as a whole, and you may even be able to do it university by university. So I guess I would say to the extent that you're concerned as a policy matter that the case by case standard is not the appropriate one, the Social Security Administration has somewhat conspicuously not amended its regulation. I would say that that policy choice is really for the agency, and they have lived with it in the Eighth Circuit for now 16 years and have not really shown any indication that they're going to amend the rule and create national uniformity. It's a very odd circumstance that this national program is being administered in a different way depending on what state you're in. So, you know, one benefit of applying the rule that's on the books is that if the government, like this Court and the Supreme Court has often held, is bound by the text of its own regulation and is held to that, that may provide additional incentive for the agency to actually amend its rule. Okay. But when you contracted with the Social Security Administration, you knew that they thought that outside of the Eighth Circuit, and Texas is outside of the Eighth Circuit, a resident is not a student. And when you know that the other side has a belief about what a word means, then you have to either affirmatively tell them that that's not the case or you're going to be bound by that meaning. So, again, That's contract. That's why I'm trying to get to contract principles because I don't know that I have to decide the world here today. I can just look at this contract. I might disagree that Texas would have known. I mean, on the books was a regulation that the agency's formal considered position, the most formal and most binding thing the agency can do. Which also doesn't define the word. The regulation defines whether you are a student for purposes of this section depends on your relationship with your employer. Right, right. But it doesn't say a student is a resident, a resident is a student, or a resident is not a student. It doesn't tell us that. That's correct. But, again, five circuits looking at that rule said residents can be students, which is all we are trying to establish here is that there's the possibility we have an opportunity. Okay. Are you saying the Social Security's position about we'll follow Apple in the Eighth Circuit and know where else was hidden was not known? No. That was published. Okay. So it was known. And that's what I'm saying is when you know your opponent thinks a word means something, it's one of these kind of unilateral belief with knowledge by the other side situations in a contract, you have to either say, hey, let's define student a different way, or residents are students, right, or something, and there's none of that here. Again, except that you have a formal regulation on the books which had been interpreted by Apple, and, you know, I think parties are entitled to rely on the law as it exists on the books. I mean, at best it was sort of. . . Well, the Social Security said we'll do it in the Eighth Circuit. We won't do it anywhere else. I mean, that's, you know, that's what the United States knew. Yes, but. . . Hey, we're not in the Eighth Circuit, so we don't have to worry about Apple. But, I mean, courts repeatedly have held agencies to the plain meaning of their own regulation against these kind of informal statements. Okay. All right. You have reserved time for rebuttal. Ms. McLaughlin. May it please the Court, good afternoon. My name is Theresa McLaughlin, and I represent the appellee. And the first thing I would like to do is to explain why the district court correctly applied the Treasury regulation that was promulgated under the Federal Insurance Contributions Act. You don't think this is contract interpretation. You don't like that approach. Oh, we do rely on the interpretation of the contract. And the first thing is that amendment number 130, modification number 130 of the section 218 agreement entered into between the Secretary of HHS and UT. And that is how these groups of employees were brought into the social security system voluntarily. In modification 130, the state and HHS expressly agreed to have the Federal Insurance Contributions Act apply. Specifically, they agreed that the state would pay the Secretary of the Treasury amounts equivalent to the taxes. Well, in 1987, those equivalent amounts became actual taxes. Amounts equivalent to the taxes that would be imposed by sections 1400 and 1410 of the Internal Revenue Code. If the services of the employees covered by the agreement constitute employment as defined in section 1426 of such code, that was the numbering of the Internal Revenue Code of section 1939. The provisions defining employment and also exclusions from employment contained in section 1426 of the 1939 code are now found in section 3121B of the Internal Revenue Code. So that is why no one contests that by entering into a section 218 agreement, the state and the Secretary of HHS are agreeing that the provisions of 42 USC involving coverage apply. But this agreement, from the time these employees were voluntarily opted into the system by the state, the state agreed to have the taxability of the employment governed by what is the provisions now found in section 3121B. Wouldn't it be possible to come up with residents being taxed because they would meet the employment definition, even though in fact and case by case and all of the evidence shows that they are primarily there to continue their medical education because they're getting a salary and they're working 40 hours or whatever that reg calls? And wouldn't you have that conflict? Well, we submit that the Supreme Court in the Mayo case allowed the Treasury to write a bright line rule saying that work services, the performance of services always predominates over study if you're working 40 hours a week or more. So that bright line rule has been upheld by the Supreme Court. So if the Treasury regulation applies, there's no dispute that all of the residents in the UT system worked at least 40 hours a week. Even if the evidence shows conclusively that they're first and foremost continuing their medical education. Well, the Supreme Court has spoken. And the Supreme Court upheld the bright line rule. So no, no trial would be necessary. And so I would like to address the other provision in the section 218 agreement that has a potential application to this case. In 1998, after the Social Security Administration lost the Minnesota v. Apfel case involving Social Security coverage of the residents employed by the University of Minnesota, a state agency that had a section 218 agreement, Congress created an opportunity for those state agencies that had treated students as covered employees voluntarily to opt out with respect to those. Normally, if the state voluntarily agrees to cover students, they may not opt out of that. But the special opportunity was created for states to amend their section 218 agreements. So in 1999, the section 218 agreement was amended in modification 1496 to take advantage of the opportunity created by that law. And so that made students potentially, if they qualified for the student exclusion in FICA or the Social Security Act to be exempt from coverage or taxation as the case may be. And as UT would construe this agreement or this modification, its medical residents would first have to fail to satisfy the SSA's student exclusion in order to then be subject to FICA and the Treasury's full-time employee rule. But modification 1496 is not contingent upon satisfying the SSA's student exception. It doesn't even refer to the SSA provision, which is 42 USC section 404A10. What it does is it paraphrases the statutory language that is found in both the Internal Revenue Code's student exclusion and the SSA's student exclusions. Regarding the performance of services by a student enrolled in regularly attending classes at a school, college, or university. So that modification did nothing to change the initial agreement in modification 130 that the Federal Insurance Contributions Act would apply in determining what is employment for taxability purposes. So, and as a matter of contract interpretation, it makes no sense to have coverage under the Social Security Act act as a hurdle to get through before you actually have to pay FICA tax. What the section 218 agreement did was the state and the secretary agreed not just that the Social Security Act would apply, but that the Internal Revenue Code's definition of employment would apply. And so that's why we think that the district court was correct when it applied the Treasury regulation embodying the full-time employee rule. And so going to the FICA, section 3121B includes intaxable employee. Essentially all remunerative services, except those that are specifically accepted. And state employment is ordinarily exempt, but there are several ways to be swept in. There are several subsections to section 3121B7. And here, since UT dropped its refund claims as to those medical residents who were not covered by a qualifying state retirement system and would have been swept into Social Security that way, the way that UT's medical residents are potentially come into FICA is that their employment includes service under a section 218 agreement. And I think I just demonstrated that the state and HHS agreed that FICA would apply to the definition of employment. So although we think that the district court did the right thing in applying the Treasury regulation and the full-time employee rule, but we do want to point out that although the district court said that it saw no controlling authority for applying the Treasury regulation, we think that the Supreme Court's, in the Mayo case, made it crystal clear that if service for a state falls within an exception to the general exclusion of services performed by a state, then the Treasury regulation applies. And all those subsections of section 3121B7 are phrased in the disjunctive. They're connected by or. So if employment for a state comes within the statute for any of those reasons, then the employment is subject to FICA. Now, in Mayo, the University of Minnesota was a party to that case in both the Eighth Circuit's opinion and before the Supreme Court. And the reason, even though the University of Minnesota had a 218 agreement, later on they admitted that their medical residents were not covered by a qualifying state retirement system, so they came in that way. But the Supreme Court applied FICA to determine, and the full-time employee rule to determine, the taxability of the University of Minnesota's residents. So then I would also like to go on to the point that, although we think that FICA applies and that the district court correctly said so, even if the Social Security Act does apply, UT's medical residents are not accepted as students under the SSA's student exclusion. And to begin with, the student exception was intended to cover part-time, intermittent employment for nominal wages that was a nuisance to take care of and that resulted in only an inconsequential loss of benefits. And medical residents are working full-time and they're making a living doing so. And if they aren't covered for several years after graduation from medical school, then they risk losing the chance to get benefits in case of an untimely death or something like that. And the Supreme Court in Mayo recognized that breadth of coverage is a very important goal of both components of the Social Security system and that the statute has to be construed with that goal in mind. But there are several other reasons indicating that medical residents are not students. First, the student exception was enacted at the same time as an exception for interns the first year after medical school working in a hospital. And if medical residents really were students, then there would have been no reason for Congress to have enacted the intern exception, you know, to exclude the first year of residency. Other than to get rid of an ongoing debate. Well, perhaps. But the Sixth Circuit in the St. Luke's Hospital case concluded, was asked, would you please extend this intern exception to residents in the second year and beyond of the residency? And the Sixth Circuit said, no, we don't think that that's appropriate. And the Congressional response, the very next year in 1965, decided not only did not extend the intern exception to residents, but it repealed the intern exception entirely. And as part of the same legislation, and actually the legislative history discusses how important it is to cover medical residents so that they don't lose their benefits. And also as part of that 1965 legislation, Congress accepted interns working at hospitals of the federal government and District of Columbia government from a list of other trainees working at those same hospitals, all of whom were exempt from certain other federal pay and benefits laws. And Congress took the trouble to accept medical and dental interns and residents from an exclusion under section 3121B6B and 3121B7C, two little I's. So, and the Supreme Court in Mayo, when it was confronted with Mayo's claim that it was arbitrary to prevent medical residents from having an opportunity to demonstrate that study prevailed over making a living, that the existence of this legislation, making sure that federal residents and interns would still be covered, cast doubt on any claim that Congress ever intended medical residents to be exempt. So, anyway, that provision involving the federal and D.C. residents would have been superfluous if medical residents were already considered to be students. So, and then in addition, there were a series of cases under the old Treasury regulation where the Treasury argued for a bright line rule under its old regulation. And the courts didn't feel comfortable denying the residency, the medical residents in residency programs an opportunity to prove that they were really, that study was paramount over performance of service. But none of those decisions acknowledge the point about the federal and D.C. hospital residents. What's your understanding of what a case-by-case determination means and why would that be or maybe not be a bad thing in this instance? Well, I think it would involve the Mount Sinai decision, the Mount Sinai case was tried after the 11th Circuit refused to apply a bright line rule under the old Treasury regulation. And there was proof on hospital-by-hospital, program-by-program, you know, discipline, internal medicine, surgery, and so on. So there was a lot of proof. And the Supreme Court emphasized that sometimes it's permissible to draw a bright line, to eliminate uncertainty and to avoid the waste of resources going into this kind of case-by-case determination. So the court in Mayo really expressly rejected the proposition that the Treasury has to engage in such a case-by-case inquiry. And it's in fact said that the hours worked, you know, the full-time employee rule, 40 hours or more and you're not a student, was a perfectly sensible way, page 131, Supreme Court at page 715, of separating students from others. So anyway, the Supreme Court also just described, if you work too many hours, then you're not studying. It said the Treasury wasn't distinguishing between education that took place in a clinical setting and classroom learning, but just the fact that you're working so many hours is inconsistent with student status. So it's denying on-the-job training. It has to be in a classroom? No. And they said that they pointed out that the Treasury in its regulation wasn't making that distinction, wasn't saying that the education had to be absolutely clinical. It had to be actually in classroom. And to come along and say 40 hours work, even if it's learning, is going to trip it. Well, the regulation says that the fact that once you get to 40 hours, the fact that you might still have some learning, you know, in the work content, doesn't take precedence. And the Supreme Court upheld that. I'm learning every day, but I think I'm still an employee. Absolutely, Your Honor. So I see that my time is almost up, but we think that the decision in Mayo just revitalized all of the elements of the Social Security ruling, which is also an interpretation of the SSA's own regulation, and it's therefore entitled to deference. All right. Thank you. Thank you very much. All right. Mr. Morrell, your rebuttal? A few quick points in rebuttal. To start with Judge Wiener's question, we think the consequence of the government's ruling is that you could get taxed but not get benefits. And I did not hear the government contradict that, the possibility that in the Eighth Circuit under the case-by-case standard, a resident might be determined not to get benefits, but under the government's application of the Treasury regulation, they would be forced to pay the taxes. So that, we think, is a troublesome consequence. As to the case-by-case question. With your approach, you're not going to get coverage for sure. Our approach provides parity between the benefits question and the tax question because we think the 218 agreement controls because this is a state employee provision and the 218 agreement. Right. I mean, it's parity, but the parities are not going to get any benefits. If they qualify as if they are found not to be students, then they would get benefits. But remember, these are all residents who participate in a Texas program that has to qualify under the IRS regulations as being sufficient and an alternative. So I think the state employee exemption. It's not that they're without any benefits. They're with different benefits. Different benefits. I mean, this provision, the state employee exemption, allows states to tailor these kinds of benefits to local circumstances, and the Supreme Court in Bowen explained reasons why they might want to do that. It might be more cost effective. You might be able to tailor the package and make it more attractive. You might be concerned about other aspects of the federal system. As to Mayo, Mayo certainly establishes that the Treasury Department could establish a bright line rule, but the Social Security Administration has not promulgated that bright line rule, and even the district court, I think, rejected the government's view that Mayo controls here. On the Treasury, the language in the 218 agreement, if you're looking at that as a contract that the government quoted, I think that's at 359 of the record on appeal. It basically says that the state will pay amounts equivalent to the FICA taxes for employees who are opted in. It doesn't answer the predicate question, the question we're looking at of whether the employees are opted in. That, we think, is different. With respect to the idea that Congress wanted the student exemption to only apply for part-time work or nominal wages, the current Treasury regulation specifically says the amount of money you make does not matter. It's immaterial. So even the government doesn't believe that. Obviously, applying these case-by-case standards, courts before the Treasury regulation was amended, had no trouble concluding that residents were students. We think the case-by-case analysis could well be done on an institution-by-institution basis if the facts support it. So I don't think it's particularly unmanageable. The government talks about wasteful litigation. This program that the residents have, you said there's a state program in Texas? That's correct. Which kind of mirrors what FICA provides, the Social Security program? Correct. So under the IRS regulations and under the statute, you can only be exempt as a state employee if you participate in a qualifying state program. And Texas has several state programs, one called the Optional Retirement Program, one called the Teacher's Retirement System, that provide the same kind of benefits, provide retirement benefits. And they're all optional? I believe that's right. You could be a state employee and not be in one of these programs? I don't know that I can represent that with respect to every state employee. I mean, I know that it would be part of our proof on remand that we'd have to show that each resident whose claim is at issue participated in a sufficient fashion. Don't those have kind of vesting requirements? I mean, I know the judicial one does. Right, and that's all taken care of in the IRS regulations, because it wouldn't be qualifying if you're not vested, if it's not actually going to provide a benefit. Is there immediate vesting? There's not a term of years and this and that? Again, I think the IRS regulations require... I didn't ask about the IRS regulations. I asked about your program that you're saying is so equivalent. I don't know exactly the provision. I'm happy to provide a letter to that effect if you'd like as to what the vesting thing would be. I mean, you're relying on a program you don't know the particulars of, and that's why I'm just trying to understand it. That issue was not litigated below because we were trying to establish the legal standards, so it would remain to be briefed and argued to the district court. So that really shouldn't be part of our consideration if it's really not part of the consideration the district court had. And if you don't know the answer...  Right, and so one of the programs, just for instance, is a defined contribution program. So the residents were paying in from their... Well, but that's a 401K in essence. Right, but that's a program that can qualify under the regulations. That's a lot different from Social Security. But the IRS, I think, has made that judgment in interpreting what a qualifying retirement program is. So if they had shared that concern, then it would not be qualifying and the residents would not be exempt. You're out of time, but I'm not. I'd like to get back to that very first question that Judge Graves reiterated. Can you give us an idea about what we would be saying if we said that case-by-case applies? Is it school-by-school? Is it program-by-program? Is it individual resident-by-individual resident? What are we talking about? So, you know, APFL applied the case-by-case standard and applied it to all residents at the University of Minnesota. Oh, it's across the boards and under APFL. Under APFL, it would be across the board, but you had other cases also tried under the case-by-case standard where the court was, you know, able to make a sensible determination. So I think there are common features about the UT residency program, such as the accreditation by a national... If that were done, then they could figure it out. I'm sorry? If it were ordered to be done on a case-by-case basis, the parties could figure it out. I think that's correct. I think that's what happened in all the cases that were litigated prior to the regulations. Thank you. Thank you. All right, thank you, Counsel.